LAKE CABLE, INC. and Gerald Buhrow, Plaintiffs/Respondents,

v.

Oliver TRITTLER, Jr., Personal Representative for the Estate of Oliver Trittler, Defendant/Appellant.

No. 67289.

Missouri Court of Appeals, Eastern District, Division Five.

Jan. 30, 1996.

Kenneth J. Mallin, Coburn & Croft, St. Louis, for appellant.

Dale L. Rollings, Rollings, Gerhardt, Brochers, Stuhler, Carmichael & Gartner, P.C., St. Charles, for respondent.

CRANE, Chief Judge.

Defendant, personal representative of an estate, appeals from the judgment of the trial court in plaintiffs' favor on a petition for specific performance of a corporate stock restriction agreement. The trial court found that the plaintiff corporation had exercised

its option to purchase decedent shareholder's stock, that the agreement required defendant to sell decedent's shares of the plaintiff corporation to the corporation for book value, and that the book value of decedent's stock, as defined in the agreement, was $300.00. Defendant appeals, contending that the agreement lacked consideration and that the term "book value" was erroneously interpreted, resulting in a calculation of a substantially insufficient value. We affirm.

We view the facts in the light most favorable to the plaintiffs. On July 21, 1982 decedent, Oliver Trittler, incorporated Lake Cable, Inc. (Lake Cable) as a Missouri corporation. Trittler, Gerald Buhrow, and Thomas Reese were the three original shareholders. Each made initial capital contributions of $500.00 and were issued fifty shares of Lake Cable stock. Trittler's Lake Cable stock certificate, dated July 22, 1982, bore the legend: "The transfer of the shares of this corporation is restricted by a Shareholders Agreement, a copy of which is on file at the Office of the Corporation." The Articles of Incorporation authorized Lake Cable to issue 3,000 shares.

At the time they were forming the corporation, Trittler, Buhrow, and Reese decided to enter into a restrictive stock agreement. Buhrow testified:

> We wanted some kind of agreement so we would know who would be our partner. We didn't want anyone else involved. It was kind of a buddy thing. We was very close friends, all of us, and we didn't want anybody else involved, and that's when we decided to do an agreement to restrict the sale of stock.

On August 2, 1982 Lake Cable's directors authorized Lake Cable to enter into an agreement with shareholders restricting the sale of Lake Cable stock.

On September 3, 1982 Lake Cable and each of the three Lake Cable shareholders entered into an agreement denominated "Agreement Restricting Sale of Stock" (the Agreement). The Agreement subjected each share of Lake Cable stock then outstanding or thereafter issued to the terms of the Agreement and provided that no shareholder could dispose of Lake Cable stock without first complying with the Agreement which gave Lake Cable a first right to purchase any shares and then gave other shareholders a successive right to purchase those shares. If Lake Cable or a shareholder elected to purchase the shares, paragraph 3 of the Agreement defined the purchase price as:

> the amount of the book value of said common stock as of the end of the month immediately preceding the giving of such notice. Book value shall be determined by general accounting principals [sic] consistently applied in accounting for the corporation's operations.

Paragraph 6 of the Agreement further provided that in the event of the shareholder's death Lake Cable (or a shareholder, if Lake Cable elected not to do so)

> shall have a first option ... to purchase any or all of the common stock of such decedent, at a price to be determined by the same method hereinabove provided, (book value as of the last day of the month preceding the death of the stockholder).…

The Agreement required each Lake Cable stock certificate to bear a reference to the Agreement.

Buhrow and Reese each testified that the three owners had discussed the pitfalls of a book value repurchase formula at least two or three times prior to execution of the Agreement. During each of the discussions Trittler supported using book value rather than fair market value.

In April, 1984 Reese surrendered his fifty shares to avoid a conflict of interest arising from his position as the general manager of a company doing business with Lake Cable. Reese refused to accept any money from Lake Cable when he surrendered his shares. Reese's surrender left Trittler and Buhrow each with one half of the outstanding stock in Lake Cable.

Trittler died on February 20, 1991. Pursuant to the Agreement Lake Cable, through its president, Buhrow, attempted to exercise its rights under the Agreement to purchase Trittler's outstanding stock for book value. Lake Cable tendered a check for $300.00 to defendant, personal representative for Tritt-

ler's estate, for the purchase of Trittler's fifty shares of stock. Lake Cable offered the money based on a valuation prepared by the corporation's certified public accountant, Christopher Hermann. Using the principles consistently applied in accounting for Lake Cable's operations, the cash basis method, Hermann calculated Lake Cable's book value on January 31, 1991 to be negative $39,-617.75. The only positive book value which Lake Cable had at that time was the value of the 100 outstanding shares of common stock, which Hermann valued at $600.00.

To ensure that his personal right to purchase Trittler's shares did not lapse, twenty days after Lake Cable tendered $300.00 to Trittler, Buhrow, acting on his own behalf, communicated to defendant a personal interest in purchasing the stock pursuant to the terms of paragraph 6 of the Agreement. Buhrow tendered a personal check for $300.00 to defendant for the purchase of Trittler's fifty shares of stock. Defendant did not return the stock certificate or cash either of the $300.00 checks. Lake Cable and Buhrow filed this action on May 14, 1991 seeking specific performance of the Agreement.

The trial court found that the Agreement was enforceable, that Lake Cable consistently used the cash basis method of accounting, and that Lake Cable's book value, calculated by this method, was a negative $39,617.75. It ordered defendant to return Trittler's stock certificate to Lake Cable in exchange for $300.00. Defendant appeals from this judgment.

■ On appeal of a court-tried case, we will sustain the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Rule 73.01(c); *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We accept the evidence and inferences favorable to the prevailing party and disregard all contrary evidence. *Unlimited Equip. Lines, Inc. v. Graphic Arts Centre, Inc.*, 889 S.W.2d 926, 932 (Mo.App.1994). We defer to the factual findings of the trial judge, who is in a superior position to assess credibility. *Id.* However-

er, we independently evaluate the court's conclusions of law. *Id.*

Defendant first contends that the trial court erred in concluding there was consideration for the Agreement because the Agreement does not reflect any exchange of consideration and Buhrow and Reese testified that the parties did not pay or exchange any money at the time it was signed. Defendant also asserts that the Agreement was a promise to give an option to purchase future shares, which he contends, is not consideration.

■ We disagree with these contentions. In the first place, a finding of consideration does not depend on the existence of a consideration clause or a money payment. Secondly, as explained below, sufficient consideration supports the Agreement.

■ The Agreement restricts the right to transfer stock in two situations: when the shareholder decides to dispose of his stock and when the shareholder dies. When the shareholder wants to dispose of his stock, the Agreement requires that he give written notice of his desire to sell to Lake Cable and Lake Cable may then elect to purchase some or all of those shares. If Lake Cable fails to so elect, any of the remaining shareholders may elect to purchase the stock by giving notice. Upon the death of a shareholder, Lake Cable is given a "first option" to purchase the shareholder's stock. If Lake Cable does not elect to "exercise this option" the remaining shareholders are given the option.

■ In both situations it is clear that the Agreement does not create an "option contract" but rather creates a "right of first refusal." An option consists of a continuing and irrevocable offer which the optionor cannot withdraw during a stated period. It vests the optionee with a power of acceptance, and when the optionee accepts the offer in the prescribed manner, the option is deemed to have been exercised as to create a binding bilateral contract. 1A ARTHUR L. CORBIN, CORBIN ON CONTRACTS, §§ 259, 260 (1963). This Agreement is not an option contract because it is not an offer and could not therefore create a power of acceptance.

Rather, it is a transaction by which the corporation and, in succession, the individual parties, acquired a right of first refusal or preemptive right. *See* CORBIN, *supra*, § 261. It does not give the holders of the preemptive right the immediate power to compel another shareholder to sell. Instead, in the first situation, it requires a shareholder, when and if he decides to sell, to offer the shares first to Lake Cable. The notice of the desire to sell transforms the holder's right of first refusal into an option to purchase the stock in accord with the terms of the Agreement. *See Unlimited Equip. Lines, Inc.*, 889 S.W.2d at 932. Further, if a shareholder dies, the Agreement gives Lake Cable a "first option," and the other shareholders a successive option, to purchase that shareholder's stock. The grant of a "first option . . . to purchase" in this context gives Lake Cable and the remaining shareholders a right of first refusal. *See* CORBIN, *supra*, § 261A. Accordingly, upon a shareholder's death, Lake Cable's and, successively, the other shareholders' rights of first refusal become an option to purchase the deceased shareholder's stock in accordance with the terms of the Agreement.

■ A right of first refusal or preemptive right may be created by a bilateral contract where there is a mutual exchange of first refusals or preemptive rights. CORBIN, *supra*, § 261. In the absence of a restrictive agreement, the Lake Cable shares would be freely transferable. *See Witte v. Beverly Lakes Inv. Co.*, 715 S.W.2d 286, 291 (Mo.App. 1986). Here, Lake Cable and each of its shareholders agreed to restrict the free transferability of the Lake Cable shares. In return each of the parties to the Agreement received the benefit of maintaining control of this closely held corporation by reserving to Lake Cable and its existing shareholders the right to choose their future associates and prevent unwanted outsiders from participating in the affairs of the corporation. *See generally, Black and White Cabs of St. Louis, Inc. v. Smith*, 370 S.W.2d 669 (Mo. App.1963); 1 F. HODGE O'NEAL & ROBERT B. THOMPSON, O'NEAL'S CLOSE CORPORATIONS §§ 7.02, 7.29 (3rd ed. Dec. 1987). Consideration to support the Agreement arises from the mutual exchange of first and successive preemptive rights in order to control share ownership. The trial court did not err in finding that consideration supported the Agreement.

For his second point defendant asserts that the trial court erred when it concluded that the term "book value" in the Agreement was unambiguous and ordered defendant to sell Trittler's shares in Lake Cable to plaintiffs for $300.00. He argues that the parties intended the term "book value" to mean all of Lake Cable's assets less its liabilities which, if used in this situation, would have given Lake Cable a book value between $609,330.00 and $831,795.00. He concludes that Lake Cable's tender of $300.00 for Trittler's Lake Cable shares was insufficient.

The trial court found:

16. The book value formula set forth in Paragraph 3 of the Agreement Restricting Sale of Stock is unambiguous and requires that the book value of said stock be determined by general accounting principles consistently applied in accounting for the Corporation's operations. I specifically find that the Corporation's books and records were consistently maintained on the cash basis/income tax method of accounting and that, pursuant thereto, the book value of Lake Cable, Inc. as of January 31, 1991 is a *negative* Thirty–Nine Thousand Six Hundred Seventeen Dollars and Seventy-five Cents ($39,617.75).

The term "book value" is defined in paragraph 3 of the Agreement as follows: "Book value shall be determined by general accounting principals [sic] consistently applied in accounting for the corporation's operations." Plaintiff argues that the phrase "general accounting principals [sic]" means Generally Accepted Accounting Principles (also referred to in the testimony as GAAP), a method of accounting which would have resulted in the higher valuation urged by defendant.

■ Whether the language of a contract is ambiguous is a question of law. *CIT Group/Sales Fin., Inc. v. Lark*, 906 S.W.2d 865, 868 (Mo.App.1995). To determine whether a contract is ambiguous, we consider

**436**

the whole instrument and give the words in the contract their natural and ordinary meaning. *Young Dental Mfg. Co. v. Engineered Prods., Inc.,* 838 S.W.2d 154, 156 (Mo. App.1992). We do not use forced or strained meanings and cannot use extrinsic or parol evidence to create ambiguity. *Id.* When a contract uses plain and unequivocal language, it must be enforced as written. *Smith v. Mann, Poger & Wittner, P.C.,* 882 S.W.2d 164, 167 (Mo.App.1994).

■ The contract plainly provides that "[b]ook value" was to be determined by general accounting principles "consistently applied in accounting for the corporation's operations." Giving the words their natural and ordinary meaning, general accounting principles consistently applied in accounting for Lake Cable's operations would be those accounting principles which its accountants had consistently applied in preparing Lake Cable's financial statements and maintaining its books. Defendant argues that an ambiguity exists because "general accounting principles" could refer to Generally Accepted Accounting Principles, an accounting term. We reject this contention. No such ambiguity arises from the face of the contract. Further, there is no latent ambiguity as the expert accounting testimony at trial made clear that these were separate and distinguishable concepts.

Three certified public accountants testified at trial. All agreed that the terms "general accounting principles consistently applied in accounting for the corporation's operations" and "Generally Accepted Accounting Principles" are not equivalent. They further agreed that Lake Cable consistently used the cash basis or income tax method of accounting which was a different basis of accounting from "Generally Accepted Accounting Principles."

Christopher Hermann testified that he prepared Lake Cable's financial statements, maintained its books, and prepared its tax returns from 1985 through 1994, first as an employee of Lake Cable's accountant and then as Lake Cable's accountant. He testified that he used the same accounting methods for the entire time period. He did not use and was never requested to use General-

ly Accepted Accounting Principles. Rather he used the cash basis method.

Plaintiffs also retained Walter Goerss to determine the book value of Lake Cable under the Agreement. He reviewed Lake Cable's financial and operating statements and policies from 1983 through 1991. He determined that Lake Cable consistently used the cash method of accounting and never used Generally Accepted Accounting Principles.

Defendant retained Michael Tucker. Tucker testified that he was familiar with GAAP, that he looked at the books and records of Lake Cable to determine if they were maintained in accordance with GAAP, and that he found that those books and records were maintained on a "tax basis, cash method of accounting" which was "not GAAP." He distinguished the two as different bases of accounting. He testified that GAAP had never been applied in the books and records of Lake Cable that he had received.

■ The trial court did not err in concluding that the term "book value" as defined in the Agreement was unambiguous and that it required that book value be determined by general accounting principles consistently applied in accounting for Lake Cable's operations. Because the contract was unambiguous, the trial court could not go beyond the contract to give the term "book value" a different meaning. In addition, the trial court's finding that Lake Cable had consistently used the cash basis/income tax method of accounting was supported by substantial evidence, including the uncontradicted testimony of the three accountant witnesses.

Further, the trial court's finding that book value was a negative $39,617.75 was supported by substantial evidence. Both of plaintiffs' accounting witnesses calculated Lake Cable's book value using the cash basis method. Hermann defined book value as assets minus liabilities. He testified that when he determines book value using a cash basis, he does not include good will and franchise contracts which have not been paid for. Using this method Hermann calculated Lake Cable's book value to be negative $39,-617.75 as of January 31, 1991. Lake Cable's only positive book value was the common

stock which had a value of $600.00 as of January 31, 1991. Goerss also testified that under the cash method, assets are listed at cost minus depreciation. Goodwill and franchise agreements which had no purchase cost are not included. Goerss's opinion was that Lake Cable's book value under paragraph 3 was a deficit book value of $39,617.75 which he calculated by subtracting total liabilities of $102,239.04 from total assets of $62,621.29. Accordingly, Lake Cable's tender of $300.00 for Trittler's shares was sufficient to compel defendant's performance under the Agreement.

The judgment of the trial court is affirmed.

SIMON, J., and WILLIAM E. TURNAGE, Senior Judge, concur.