**DOVER ELEVATOR COMPANY,
Plaintiff/Respondent,**

**v.**

**Robert RAFAEL, d/b/a RAFCO,
Defendant/Appellant.**

No. 69316.

Missouri Court of Appeals,
Eastern District,
Division Two.

Dec. 24, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 19, 1997.

Application to Transfer Denied
March 25, 1997.

Jeffrey J. Kalinowski, Peper, Martin, Jensen, Hetlage & Maichel, St. Louis, for defendant/appellant.

Peter J. Krane, Armstrong, Teasdale, Schlafly & Davis, St. Louis, for plaintiff/respondent.

CRANE, Presiding Judge.

This appeal involves an attempt by an office building owner to terminate an elevator maintenance contract and the office building owner's claim that maintenance was not "regularly and systematically" performed. It raises issues of the ambiguity of the termination provisions of the contract and the admission of opinion testimony by witnesses who were not disclosed under Rule 56.01(b)(4).

Defendant Robert Rafael is the owner of an office building located at 901 North Spoede Road, Creve Coeur, Missouri. On April 28, 1988 Rafael entered into a Master Maintenance Agreement ("Agreement") for a five-year term with Dover Elevator Company ("Dover") in which Dover agreed to "regularly and systematically" service a passenger elevator in Rafael's office building for a monthly fee of $149.29. The termination provision of the Agreement provides:

> This Agreement is effective as of May 1, 1988 (the anniversary date) and will continue thereafter until terminated as provided herein. Either party may terminate this agreement at the end of the first five years or at the end of any subsequent five-year period by giving the other party at least (90) days prior written notice.

Rafael gave notice of termination of the Agreement by letter dated June 21, 1993. In a letter dated June 24, 1993, a Dover service salesman, Thomas Jackson, stated that Rafael's notice of termination was unacceptable. He advised Rafael that the Agreement "required 90 days *prior* written notice for termination or change. The date of your letter is almost two months late with proper notification." The letter further advised that Dover would continue to service the elevators. Rafael continued to make monthly payments to Dover through September, 1993. After September 21, 1993 Rafael denied Dover access to his building and stopped making payments.

In August, 1994 Dover filed an action against Rafael seeking damages for breach of contract and to recover money on account. Rafael filed a counterclaim to recover damages for Dover's breach of its contractual obligations to "regularly and systematically" "examine, adjust, lubricate" and provide various elevator maintenance services as stated in the contract. The jury returned a verdict in Dover's favor on its breach of contract claim and awarded damages in the amount of $8,195.00. The trial court found for Dover on its action on account and awarded Dover $568.02 for unpaid service charges and $11,432.00 in attorney's fees and collection costs.

In his first point on appeal, Rafael asserts that the trial court erred in ruling that the termination provision of the agreement was unambiguous as a matter of law and in excluding extrinsic evidence as to the meaning of the termination provision.

Prior to trial Dover filed a motion in limine to exclude any evidence of the meaning of the termination provision of the Agreement on the grounds that the termination provision was unambiguous. The court found that the termination provision was not ambiguous and sustained the motion.

Rafael argues that this ruling was erroneous because the termination provision is ambiguous on its face. He contends that the provision was susceptible to an additional meaning that either party could terminate by giving ninety days notice on or after May 1, 1993.

Whether the language of the contract is ambiguous is a question of law. *Lake Cable, Inc. v. Trittler,* 914 S.W.2d 431, 435 (Mo.App. 1996); *CIT Group/Sales Fin., Inc. v. Lark,* 906 S.W.2d 865, 868 (Mo.App.1995). A contract is ambiguous if the terms are susceptible to more than one meaning so that reasonable persons may fairly and honestly differ in the construction of the terms. *CIT Group/ Sales Fin. Inc.,* 906 S.W.2d at 868. A contract is not ambiguous merely because the parties disagree over its meaning. *Id.*

In determining whether a contract term is ambiguous, the court considers the whole instrument and gives the words in the contract their natural and ordinary meaning. *Lake Cable, Inc.,* 914 S.W.2d at 435–36; *Jake C. Byers, Inc. v. J.B.C. Investments,* 834

S.W.2d 806, 816 (Mo.App.1992). The court does not use "forced or strained meanings and cannot use extrinsic or parol evidence to create ambiguity." *Lake Cable, Inc.,* 914 S.W.2d at 436. When a contract uses plain and unequivocal language, it must be enforced as written. *Id.*

 The Agreement clearly provides that a party may terminate the agreement at the end of the first five-year period or at the end of any subsequent five-year period by giving at least ninety days *prior* written notice. " 'A provision that a contract may be terminated at one or more specified dates by giving 30 days notice requires that the notice be given 30 days before one of those dates; and time is of the essence.' " *Missouri Goodwill Indus. v. Johannsmeyer,* 901 S.W.2d 154, 156 (Mo.App.1995) (quoting 6 CORBIN, CORBIN ON CONTRACTS § 1266, at 65–66 (1962)); *see also, Lowell Staats Mining Company, Inc. v. Pioneer Uravan, Inc.,* 596 F.Supp. 1428, 1430–33 (D.Colo.1984) (finding a similar termination clause unambiguous). Under the Agreement the first five-year period ended on May 1, 1993. The word "prior" refers back to the "end" of a five-year term. To effectively terminate on May 1, 1993, Rafael would have to have given notice of termination ninety days *prior* to May 1, 1993, that is, by January 31, 1993. This provision clearly contemplated automatic renewal for successive five-year terms unless notice was given at least ninety days before the end of a five-year term.

Rafael urges a forced and strained interpretation. Under Rafael's interpretation, the provision allowing termination at the end of each five-year period would be meaningless because a party could terminate at any time after the initial five-year period by giving a ninety day notice. The word "prior" would not be referable to the end of a term but to any date chosen by a party to terminate. The plain language of the termination provision is not susceptible to such an interpretation. Point one is denied.

In his second point Rafael alleges that the trial court erred in permitting two of Dover's witnesses, Thomas Jackson and Richard Henley, to testify as to the meaning of the term "regularly and systematically" in the elevator maintenance industry because neither witness had been identified as an expert pursuant to Rule 56.01(b)(4) and their testimony was not incidental to their fact testimony.

In Rafael's counterclaim he alleged that Dover breached the agreement by failing to "regularly and systematically" provide services in that there were months when Dover did not provide service. Rafael also alleged Dover's failure to perform as a defense to Dover's breach of contract.

At trial Jackson and Henley were both called as witnesses in plaintiff's case. Henley, a service salesman for Dover Elevator, was responsible for the maintenance agreement with Rafael. On direct examination he was asked, without objection, how he would determine "whether an elevator is regularly and systematically serviced; whether Dover programmed regular and systematic service to Rafael's elevator; and whether Dover's service was in fact regular and systematic." On cross-examination Rafael's attorney asked Jackson:

> Q. Now, let's talk about the words regular and systematic, what they mean. As I understand, the words to you mean what they mean in the dictionary. Is that accurate?

This was followed by testimony concerning the applicability of various dictionary definitions. Rafael's counsel then asked several questions about whether Jackson thought "regularly and systematically" meant "once a month." Jackson disagreed. Rafael's counsel also read portions of Jackson's deposition questions and answers relating to Jackson's belief that Dover "regularly and systematically" serviced Rafael's elevator.

Henley, a Dover service superintendent, testified that he designed elevator servicing programs for Dover's customers. He also testified without objection that the Rafael elevator was serviced in a regular and systematic manner, why he thought so, and why servicing was not based on a calendar month. Rafael's attorney also cross-examined him on the "regularly and systematically" provision in the Agreement.

At trial Rafael offered the expert opinion testimony of Bill Gerngross who testified

that the terms "regularly and systematically" as used in the elevator maintenance industry means maintenance service to be rendered one time a month. In rebuttal Dover called Jackson and Henley. Rafael did not object to these witnesses' qualifications as experts, but sought to exclude their testimony on the grounds that they had not been disclosed as experts pursuant to Rule 56.01(b)(4). Initially the trial court did not allow them to testify to the meaning of "regularly and systematically." However, after a bench conference, the trial court ruled that the witnesses could testify as to what the term "regularly and systematically" meant in the context of the elevator maintenance industry and reopened the case to allow them to do so.

■ Rule 56.01(b)(4) has generally been interpreted to apply to disclosure of retained experts. *Owen v. City of Springfield,* 741 S.W.2d 16, 20 (Mo. banc 1987); *Krug v. United Disposal Inc.,* 567 S.W.2d 133, 135 (Mo.App.1978)[1]. Fact witnesses to the events and transactions of the case do not become expert witnesses within the meaning of Rule 56.01(b)(4) even if their testimony incidentally calls upon their learning and experience for conclusions and opinions. *Owen,* 741 S.W.2d at 20.

■ Jackson and Henley were Dover employees who had direct responsibility for the maintenance contract with Dover. They were not engaged by Dover in anticipation of litigation, but were observers and participants in the events and transactions of the case. They were extensively examined and cross-examined on their understanding of the words "regularly and systematically" in the Agreement before they were asked to give their opinion as to the meaning of the term within the industry. Even if testimony as to the meaning of the phrase within the industry incidentally called upon their many years of experience as employees of Dover and other elevator companies for conclusions and opinions, they were not "expert witnesses" as used in Rule 56.01(b)(4).

Rafael argues that *Owen* does apply because the witnesses' opinion testimony was not "incidental" to their fact testimony. We

disagree. Their understanding of "regularly and systematically", based on contract language, course of dealing, and dictionary definitions, was a major part of their fact testimony and cross-examination. Their understanding of this term according to the industry standard was incidental to this testimony. Point two is denied.

Dover has moved for attorneys' fees on appeal in the amount of $11,097.00. The Agreement provides for an award of fees in an action to collect amounts in default. Dover's counsel has filed an affidavit in support of the fee request. Rafael has not filed any response in opposition to the request and did not appeal the trial court's award of attorney's fees. Accordingly, the fees are awarded in the amount requested. *Tull v. Housing Auth. of City of Columbia,* 691 S.W.2d 940, 943–44 (Mo.App.1985).

The judgment of the trial court is affirmed. Dover Elevator Company is given judgment in the amount of $11,097.00 for attorney's fees on appeal.

GERALD M. SMITH and PUDLOWSKI, JJ., concur.

1. Rule 56.01(b)(5), which applies to disclosure of non-retained experts, became effective July 1, 1996.