Bobbi BYDALEK, Appellant,

v.

James P. BRINES and Joyce L. Brines,
husband and wife, William L. Gehrs, Jr.,
and Betty[1] Jo Gehrs, husband and wife,
Respondents.

No. 21102.

Missouri Court of Appeals,
Southern District,
Division Two.

June 30, 1997.

---

1. Documents in the record signed by this party show her forename is "Bette," not "Betty." However, by reason of Rule 81.03, Missouri Rules of Civil Procedure (1997), which provides that "the title of the action shall not be changed

Larry G. Luna, Branson, for appellant.

Kerry D. Douglas, Bolivar, for respondents.

CROW, Presiding Judge.

The trial court entered summary judgment declaring that an option by Plaintiff, Bobbi Bydalek, to buy certain real estate from Defendants (the Brineses and the Gehrses) expired September 12, 1995. Plaintiff appeals.

Because there was no trial (hence, no transcript), we mine the facts from the sources available to the trial court, i.e., the pleadings, three documents signed by the parties, excerpts from two depositions, and an affidavit of Defendant James P. Brines.[2]

On March 16, 1994, Plaintiff and all four Defendants signed two documents. One was denominated "Real Estate Purchase Agreement." We henceforth refer to it as "the Agreement." The other document was denominated "Option to Purchase." We henceforth refer to it as "the Option."

The Agreement recited that Plaintiff had earlier contracted to buy "certain unimproved real property" from Branson Commercial Property Investors Joint Venture ("BCPI"), and that Plaintiff expected that transaction "to close on or before May 2, 1994." We henceforth refer to the "unimproved real property" that Plaintiff contracted to buy from BCPI as "the Land."

---

in consequence of the appeal," we set forth the parties' names as they appear on the petition.

**2.** The statement of facts in Plaintiff's brief, combined with the statement of facts in Defendants' brief, provides only minimal help in marshaling the facts. Contrary to Rule 84.04(h), many allegations in the statement of facts in Plaintiff's brief are unaccompanied by a reference to a specific page in the record. Furthermore, although it is evident from the briefs that counsel for each side is familiar with the facts, apparently it did not occur to counsel that this court lacked counsels' familiarity. The meager statement of facts in Plaintiff's brief and the skimpy statement of facts in Defendants' brief sent us on an operose exploration of the record to extract enough facts for a reader to understand the dispute and our resolution of it.

The Agreement declared that Plaintiff desired to sell the Land to Defendants, and that Defendants desired to buy the Land from Plaintiff. The price to be paid by Defendants to Plaintiff for the Land was $3,500,000. The Agreement required Defendants to deposit $50,000 in escrow within a week. At closing, the $50,000, together with an additional $2,950,000, was to be paid to Plaintiff. The remaining $500,000 was to be paid by two promissory notes: a $350,000 note at six percent interest per annum and a $150,000 note at no interest. Each note was to be due one year after the closing (or sooner if rights under the Option—discussed *infra*—were exercised).

The Agreement required Plaintiff to provide Defendants a "title commitment" showing Plaintiff to be the owner of "good and marketable fee simple title" to the Land, free and clear of all claims "including those arising out of a certain lawsuit now pending ... styled *Roy Birdsong, Collier* [sic] *Kelling, Plaintiffs v. Bobbi Bydalek, et al., Defendants.*" [3]

The Agreement set the closing date as May 2, 1994. As reported earlier, the Agreement recited that Plaintiff expected to acquire the Land from BCPI no later than that date. However, perhaps anticipating the possibility that Plaintiff would not acquire the Land from BCPI by that date, the Agreement provided:

"If Seller[4] is unable to acquire merchantable title to the [Land] and unable to close, through no fault of Buyer or Seller, on or before May 2, 1994, Buyer and Seller agree to extend the closing through and including May 2, 1995, and at the option of Buyer may be extended indefinitely thereafter pending acquisition of merchantable title by Seller. At Buyer's option, Buyer may terminate this agreement at any time after May 2, 1995, by giving notice as provided herein, in such event, the earnest money deposit shall be returned to Buyer, and neither Seller nor Buyer shall be obligated to the other upon such termination."

We now turn to the Option.

The Option stated Defendants would sell the Land to Plaintiff for $4,500,000 provided that written notice "of the exercise of the option to purchase ... be given to [Defendants] by [Plaintiff] ... at any time before 5:00 p.m. Central Standard Time on the ____ day of _____, 1995." [5]

The reason Plaintiff wanted an option to buy the Land back from Defendants for a million dollars more than she agreed to sell it to them for is found in excerpts from a deposition of Plaintiff presented to the trial court:

"Q. ... It was structured as a sale to the Gehrses and the Brineses; is that correct?

A. Well, legally, I guess, yes.

Q. Right. And then you took back an option to buy it back for roughly a million dollars more money than you were ... selling it to them for; is that correct? ... As I understand it, what you're telling me is that this was really a disguised financing arrangement?

A. Well, I didn't use the word 'disguise,' but that's what it always was. I never would have—I did not sell this land for this ... low amount of money.

Q. Okay. But ... do you understand that it was structured as a sale?

A. Yes.

Q. And then you took back or had the right to buy it back from them within a certain period of time? ... [I]s that correct?

---

**3.** After the Agreement was signed, the lawsuit identified in the title commitment proviso reached this court twice on appeal. The appeals were dismissed on each occasion because the judgment failed to dispose of all issues between all parties. *Birdsong v. Bydalek,* 905 S.W.2d 896 (Mo.App. S.D.1995); *Birdsong v. Bydalek,* 931 S.W.2d 217 (Mo.App. S.D.1996). For convenience, we henceforth refer to that lawsuit as "the Birdsong suit."

**4.** The Agreement denominated Plaintiff as "Seller" and Defendants as "Buyer."

**5.** In the copy of the Option presented to the trial court, the two blanks are filled in by handwriting showing the date as "the 12 day of September, 1995." Later in this opinion we set forth an excerpt from the deposition of a lawyer who formerly represented Plaintiff. The excerpt sheds light on when the handwritten date was inserted.

A. Yes.

. . . .

Q. But your testimony is that the purpose of all this was ... more or less a means of financing?

A. Yes, always.

Q. So that you could get the money, pay it to the people that were selling it to you, and then hopefully come up with the means of exercising this option and making a profit on it, presumably?

A. Correct."

We glean from the above testimony and from deposition testimony of the lawyer who formerly represented Plaintiff that (a) Plaintiff did not have sufficient funds to buy the Land from BCPI, (b) Defendants agreed to buy the Land from Plaintiff for $3,500,000, of which $3,000,000 was to be paid to Plaintiff in cash, (c) Plaintiff intended to use the cash she was to receive from Defendants to pay BCPI for the Land, (d) Defendants would receive title to the Land either directly from BCPI or from Plaintiff, and (e) Plaintiff would thereafter have a right under the Option to buy the Land from Defendants if Plaintiff could obtain financing to pay the $4,500,000 purchase price in the Option.

We deduce from the deposition of Plaintiff's former lawyer that after Plaintiff and Defendants signed the Agreement and the Option, the Birdsong suit went to trial. The lawyer narrated:

"[Plaintiff was] successful in the lawsuit. The losing parties who had claimed an interest in the [Land] had not put up a bond, and it was my understanding ... that if they didn't put up a bond you could go ahead just like any judgment, and the [Land] was free of the judgment if there was no bond up and the property could be sold. And the title company had issued a title commitment agreeing to insure the title to the [Land]. Then when we got to the closing ... the title company ... changed their [sic] mind and changed the commitment at the time of closing and refused to insure the title and refused to insure over the loss. So as a consequence

of the closing, supposedly good title, marketable title or whatever couldn't be conveyed to Brines and Gehrs . . . ."

Although the briefs and the record are murky as to what occurred next, we divine that the next significant event was a change in attitude by the title insurance company. We base that supposition on the following averment in the affidavit of Defendant James P. Brines: "Plaintiff was finally able to acquire a commitment for title insurance insuring merchantable title but not its marketability."

That development was apparently the stimulus for a conference between Plaintiff and Defendants (and their lawyers) on September 9, 1994. After "hours of negotiations," Plaintiff and Defendants signed a handwritten document designated "Addendum to Real Estate Purchase Agreement dated 16 March 1994." We hence forth refer to it as "the Addendum." It provided, *inter alia:*

" . . . .

4. Buyer[6] shall accept a title insurance policy in the form described in commitment number 408375, as issued by First American Title Insurance Company[7] . . . .

5. If title is not cleared, as provided herein, by September 26, 1994, Seller agrees to pay interest on 3 million dollars ... of the purchase price of the referenced contract at the rate of 11% per year, payable as hereinafter set forth, beginning on September 27, 1994, and continuing until the sale of the property as herinafter [sic] set forth, and shall be payable from the proceeds of the closing contemplated herin [sic].

6. Seller's obligation to pay interest shall continue until the later occurring of the following events, (a) 1 year from September 12, 1994 or (b) 90 days after the issuance of a final mandate by the last Missouri Appellate Court to consider the appeal mentioned in paragraph 15 of the

---

6. The Addendum denominated Defendants as "Buyer" and Plaintiff as "Seller."

7. We could not find commitment number 408375 in the record.

title commitment number 408375 mentioned above.[8]

. . . .

10 Notwithstanding any other provision herein to the contrary, Seller agrees to pay one half of the interest accrued, if the subject property has not been sold, said amount payable at the expiration of Seller's option provided herein."

As we comprehend Plaintiff's deposition, BCPI conveyed the Land to Plaintiff on September 12, 1994 (three days after Plaintiff and Defendants signed the Addendum), and Plaintiff immediately conveyed the Land to Defendants, using the money she received from Defendants to pay BCPI for the Land. We base this assumption on the following segment of Plaintiff's deposition:

"Q. . . . on September the 12th, you presumably conveyed the land to them; they gave you money, which you turned around and gave to the BCPI people. . . .

A. Yes."

Apparently, Defendants were willing to part with three million dollars in exchange for a deed to the Land even though the title insurance company insured only "merchantable title but not its marketability."

Plaintiff commenced the instant action on October 5, 1995, by filing a petition for declaratory judgment. The petition alleged, *inter alia*, that Defendants refuse to recognize "the option extension" granted Plaintiff and "have declared said option terminated on September 12, 1995 and have made a demand upon Plaintiff for the payment of moneys and other obligations triggered by the expiration of said option." The petition prayed the trial court to "declare Plaintiff's option extended to ninety (90) days after the issuance of a final mandate by the last Missouri Court to consider the judgment granted in the [Birdsong suit]." [9]

Defendants responded to Plaintiff's petition by filing a multi-count counterclaim against Plaintiff. Count I of the counterclaim averred that the deadline for Plaintiff to exercise the right to buy the Land from Defendants under the Option was September 12, 1995, and that the Addendum contained no provision extending the deadline past September 12, 1995.

As noted earlier in this opinion, the Option required Plaintiff to give Defendants written notice of Plaintiff's "exercise of the option to purchase" no later than "the ___ day of _____, 1995." In the copy of the Option presented to the trial court, the two blanks had been filled in by handwriting, showing the date as "the 12 day of September, 1995." [10]

During his deposition, Plaintiff's former lawyer was asked about the handwriting. His testimony:

"Q . . . the date on page one of . . . the option, which is September 12, 1995, I believe?

A Yes.

Q Has been handwritten in obviously into a blank that was left there—

A Yes.

Q —by someone at one time. Do you know when that was filled in?

A Well, I think that's in my writing. . . . And I think I filled that in at a time when we were getting ready to close, but before I realized that the title wasn't any good, that they wouldn't insure the title. I mean if the title had been good then we wouldn't have had this problem, it would have been a year. But since the title wasn't good, Ms. Bydalek couldn't sell it, it would have defeated the whole purpose of the option. And so we had to have a right

8. Inasmuch as we could not find title commitment number 408375 in the record (see footnote 7, *supra*), we could not identify the "appeal" referred to in paragraph 6 of the Addendum. However, we glean from the pleadings and the parties' briefs that the "appeal" referred to in paragraph 6 of the Addendum was the first set of appeals in the Birdsong suit (see footnote 3, *supra*).

9. This court dismissed the first set of appeals in the Birdsong suit a month before Plaintiff filed her petition in the instant action. See footnote 3, *supra*.

10. Footnote 5, *supra*.

to sell it after the title was approved. Now we hoped that the title company would change its mind or maybe we would get another title company, or the decision would be made, you know, and then Ms. Bydalek could sell the property; but they couldn't sell it or she couldn't sell it when the title wasn't any good. So, you know, obviously when that date was put on there we should have written on here somewhere 'option extended pursuant to terms of addendum' but we didn't."

Count I of Defendants' counterclaim prayed the trial court, *inter alia,* to declare that Plaintiff has no right, title or interest in the Land and that her option to buy it has expired.

After taking the depositions of Plaintiff and her former lawyer, Defendants moved the trial court for summary judgment.

The trial court, after considering the sources listed in the second paragraph of this opinion, entered an "Amended Order for Summary Judgment." It declared, *inter alia:* "[T]he Addendum ... did not extend the Plaintiff's option to purchase and that said option expired September 12, 1995." The trial court further held that Plaintiff has no right, title or interest in the Land.

The judgment recited that it disposed of Plaintiff's petition and Count I of Defendants' counterclaim, but that the other counts of the counterclaim remained pending. The judgment further recited that because the disposition of Plaintiff's petition and Count I of Defendants' counterclaim may affect the unadjudicated counts, "there is no just reason for delay pursuant to Rule 74.01 ... and thereby finds that this Order is appealable."

This appeal followed.

The sole point relied on in Plaintiff's brief reads:

"The trial court erred in sustaining Defendants' motion for summary judgment because the handwritten Addendum extended the option term as a matter of law in that:

1) the Option agreement and Real Estate Purchase Agreement, executed simultaneously, consttitute [sic] a single transaction and must be construed together; and

2) paragraph 5 of the Addendum is unambiguous in providing for payment of interest until the option is exercised and paragraph 6 is unambiguous in defining the period in which it may be exercised; or

3) alternatively, if the terms of the Addendum are ambiguous, then a genuine issue of material fact is created by the deposition testimony of Plaintiff and her counsel regarding statements by Defendants and their agents that express their intent to extend the option until the title was clear."

Appellate review of a summary judgment is governed by *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371 (Mo. banc 1993). The appellate court reviews the record in the light most favorable to the party against whom judgment was entered. *Id.* at 376[1]. Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. *Id.* at [2]. The appellate court accords the non-movant the benefit of all reasonable inferences from the record. *Id.* at [3].

Appellate review is essentially *de novo. Id.* at [4]. The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of granting the motion initially. *Id.* at [5]. The propriety of summary judgment is purely an issue of law, and inasmuch as the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment. *Id.* at [6].

Paragraph 1 of Plaintiff's point relied on maintains that because the Agreement and the Option were executed simultaneously, they must be construed together. Plaintiff cites two cases in support of that premise.

Defendants, as we understand their brief, do not challenge that premise; consequently, we shall assume, without deciding, that the premise is sound.

That leads us to paragraph 2 of Plaintiff's point relied on, which avers that paragraphs 5 and 6 of the Addendum are unambiguous and, read together, define the period during which Plaintiff can exercise her right to buy the Land under the Option.

Plaintiff begins her argument in support of that hypothesis by asserting that even though the Addendum mentions only the Agreement (and says nothing about the Option), when the Agreement and the Option are read together, it is evident that the intent of the parties in signing the Addendum was to amend both the Agreement and the Option. In Plaintiff's words: "The mere fact that the Addendum specifically referenced the ... Agreement only, does not limit its construction to that document if it substantively addressed the [O]ption, a document that arose from the same transaction."

Proceeding onward from that assumption, Plaintiff says the Addendum was signed because title to the Land was adversely affected by the Birdsong suit. Plaintiff avers: "In interpreting the Addendum, it is reasonable to expect that any defect which would ultimately affect the Defendants' title would also serve as a problem for Plaintiff's efforts to repurchase."

Plaintiff then focuses specifically on paragraph 5 of the Addendum which, as we have seen, requires her to pay interest at 11 percent per annum on three million dollars beginning September 27, 1994, and continuing "until the sale of the property as herinafter [sic] set forth, and shall be payable from the proceeds of the closing contemplated herin [sic]."

Plaintiff argues that the phrase "sale of the property" in paragraph 5 refers to an anticipated purchase of the Land by her from Defendants, not the purchase that occurred September 12, 1994 (three days after the Addendum was signed), i.e., the purchase of the Land by Defendants.

According to Plaintiff, the phrase in paragraph 5 stating that the interest to be paid by Plaintiff to Defendants "shall be payable from the proceeds of the closing contemplated herin" [sic] demonstrates that the parties intended that Plaintiff would pay Defendants the interest when she closed her purchase of the Land from them pursuant to the Option. Plaintiff argues that because the interest was to be paid on that occasion, paragraph 5 of the Addendum "must then be construed together with paragraph 6."

According to Plaintiff, paragraph 6 "accomplishes two things." First, says Plaintiff, paragraph 6 provides for the continued accrual of interest to "offset Defendants' concerns regarding the title." Second, asserts Plaintiff, paragraph 6 "defined the term of the option as was contemplated in paragraph 5." Plaintiff explains: "Subsection (b) [of paragraph 6] gave Plaintiff a 90 day window in which to market the [Land] once the title was cleared with the final appellate mandate. This would allow a sufficient period in which to obtain title commitments and to coordinate a closing pursuant to a repurchase under the option." Amplifying that hypothesis, Plaintiff argues, "It makes no sense that Plaintiff would continue to pay interest on $3 million in the event her option expired on September 12, 1995 and the appeal had not become final."

Having set forth Plaintiff's contentions—as we grasp them—regarding paragraphs 5 and 6 of the Addendum, we turn to Defendants' contentions regarding those paragraphs.

Defendants concede that the "sale" of the Land referred to in paragraph 5 is the sale that would occur if Plaintiff exercised her right to buy the Land from Defendants under the Option. However, emphasize Defendants, paragraph 5 is void of any language that could be construed to extend the "original expiration date of September 12, 1995."

Defendants acknowledge that paragraph 5 may create a question as to when the interest was to be paid, but Defendants assert that paragraphs 6 and 10 "at least partially clarify that question." Defendants point out that under paragraph 6, interest accrues until the later of either September 12, 1995, or 90 days after issuance of a mandate by the last Missouri appellate court to consider the appeal in the Birdsong suit.

Summarizing their position regarding paragraph 5, Defendants say:

"Thus, all that can be said about Paragraph 5 is that it created an obligation on the part of [Plaintiff] to pay interest while the [Land] was unmarketable as a result of the [Birdsong suit]. Since the [Defendants] were effectively tieing up $3.5 million in a piece of land that no one believed to be marketable pending a determination ... of the correctness of the trial court's order in the [Birdsong suit] ... it is both understandable and reasonable that [Defendants] in this case would want and demand compensation for proceeding with the purchase of the [Land] under circumstances that were drastically different than those contemplated by the original [Agreement] and Option."

In regard to paragraph 6 of the Addendum, Defendants assert:

"The purpose of Paragraph 6 is clear: To further define the time frame within which the obligation to pay interest continues. That period is defined as the [later] of either one of two events."

Defendants concede that the Addendum contains some references to an exercise by Plaintiff of her rights under the Option. However, emphasize Defendants, nowhere does paragraph 6 extend Plaintiff's deadline for exercising those rights. Instead, say Defendants, "[W]hat Paragraph 6 does is to define an ending period for interest." Defendants add, "[T]hat ending period logically occurs when the [Land] is no longer unmarketable," i.e., 90 days after the Birdsong suit is finally resolved on appeal, or when the Option expires on September 12, 1995, whichever event occurs last.

In her reply brief, Plaintiff argues that Defendants' position "is untenable, defying logic and good sense." Plaintiff points out that if paragraph 6 means what Defendants say it means, Plaintiff would have been obliged to pay Defendants interest until September 12, 1995, even had Plaintiff exercised her right to buy the Land from Defendants prior to that date. That is, Plaintiff's obligation to pay interest would have extended past the date she bought the Land from Defendants.

Although that hypothetical situation might have occurred, we disagree with Plaintiff's

notion that it would have defied logic and good sense. When Defendants signed the Addendum on September 9, 1994, one of the inducements was the prospect of earning 11 percent interest on three million dollars. Paragraph 6 of the Addendum assured Defendants that they would earn the interest until September 12, 1995, even if a Missouri appellate court issued a mandate in the Birdsong suit sooner than that (or if Plaintiff exercised her rights under the Option sooner than that).

■ Having carefully considered the positions of the parties regarding paragraphs 5 and 6 of the Addendum (the only paragraphs of the Addendum mentioned in Plaintiff's point relied on), we hold those paragraphs do not, either individually or together, extend Plaintiff's deadline for exercising her rights under the Option beyond September 12, 1995. We find no ambiguity about the deadline in the Option, and inasmuch as the deadline is unmentioned in the Addendum, there is obviously no ambiguity about the deadline there.

■ Where a contract is clear and unambiguous on its face, it is not open to judicial construction. *Speedie Food Mart, Inc. v. Taylor,* 809 S.W.2d 126, 129[5] (Mo. App. E.D.1991). A court cannot go outside an unambiguous agreement and make a new contract for the parties. *Grantham v. Rockhurst University,* 563 S.W.2d 147, 150[5] (Mo.App.1978). We therefore hold paragraph 2 of Plaintiff's point relied on is without merit.

However, before leaving paragraph 2 of Plaintiff's point, we observe that in the argument following the point Plaintiff refers to paragraph 10 of the Addendum and avers it supports her position.

Defendants remind us that paragraph 10 of the Addendum is unmentioned in Plaintiff's point. Consequently, say Defendants, a contention that paragraph 10 extends the deadline in the Option is not preserved for review. While Defendants may be correct, we shall nonetheless consider Plaintiff's argument.

An alert reader will recall that in paragraph 10 of the Addendum, Plaintiff agreed to pay "one half of the interest accrued, if the subject property has not been sold, said amount payable at the expiration of [Plaintiff's] option provided herein." Plaintiff asserts that a "common sense application" of paragraph 10 with paragraph 5 leads to the conclusion "that subsections (a) and (b) of paragraph 6 are intended to further define the term of the option." However, Plaintiff does not explain why or how that is so.

Defendants point out that paragraph 10 of the Addendum covers the situation where Plaintiff fails to exercise her rights under the Option prior to the deadline, but says nothing about extending the deadline.

We agree. At best (from Plaintiff's standpoint), paragraph 10 arguably excuses her from paying half the interest due Defendants under paragraphs 5 and 6 of the Addendum if Plaintiff fails to exercise her rights under the Option prior to the deadline. However, nothing in paragraph 10 explicitly or implicitly extends the deadline.

In sum, while there may be ambiguities when the Agreement, the Option, and the Addendum are considered together, we find no ambiguity in regard to when Plaintiff's rights under the Option expire. The Option (after Plaintiff's lawyer filled in the blanks by handwriting) set the deadline at September 12, 1995, and nothing in any of the three documents before the trial court altered that deadline.

Because the Birdsong suit was not finally resolved by a Missouri appellate court prior to the deadline for Plaintiff to exercise her rights under the Option, Plaintiff may now regret the bargain she made with Defendants. However, the policy of the law is to let parties weigh the benefits pro and con and leave them free to make whatever contract between themselves that they please. *Christeson v. Burba,* 714 S.W.2d 183, 195[5] (Mo.App. S.D.1986); *Hathman v. Waters,* 586 S.W.2d 376, 385 (Mo.App. W.D.1979). The general rule of freedom of contract includes the freedom to make a bad bargain. *Sanger v. Yellow Cab Company, Inc.,* 486 S.W.2d 477, 481–82[6] (Mo. banc 1972).

Paragraph 3 of Plaintiff's point relied on presents an alternative theory of error based on the premise that the terms of the Addendum are ambiguous. Inasmuch as we have found no ambiguity regarding the date upon which Plaintiff's rights under the Option were to expire, we reject paragraph 3 of Plaintiff's point relied on without further discussion.

Judgment affirmed.

SHRUM, J., and MONTGOMERY, C.J., concur.