**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 1 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENH CIRCUIT

---

FRU-CON CONSTRUCTION
CORPORATION, a Missouri corporation;
FRU-CON ENGINEERING, INC., a
Missouri corporation,

     Plaintiffs-Appellants,

v.

KFX, INC., a Delaware corporation; K-
FUEL PARTNERSHIP, a Michigan
general partnership; THEODORE
VENNERS, individually; KOPPELMAN
FUEL DEVELOPMENT COMPANY, a
California limited partnership,

     Defendants-Appellees,

No. 97-8055

---

Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 95-CV-286D)

---

John M. Horas, of Cockriel, Horas & Radice, L.L.C., St. Louis, Missouri (Steven
M. Cockriel of Cockriel, Horas & Radice, L.L.C., St. Louis Missouri; Patrick R.
Day, P.C. and Lawrence J. Wolfe, P.C., of Holland & Hart, Cheyenne, Wyoming;
and Joseph W. Halpern of Holland & Hart LLP, Denver, Colorado, with him on
the briefs), for Plaintiffs-Appellants.

Steven F. Freudenthal of Herschler, Freudenthal, Salzburg, Bonds & Zerga, P.C.,
Cheyenne, Wyoming (Joseph Butler of Bangs, McCullen, Butler, Foye &

Simmons, LLP, Rapid City, South Dakota, with him on the brief), for Defendants-Appellees.

Before **SEYMOUR**, Chief Judge, **PORFILIO** and **HENRY**, Circuit Judges.

**SEYMOUR**, Chief Judge.

In this diversity action, Fru-Con Construction Corp. and Fru-Con Engineering, Inc. (Fru-Con) brought suit against KFX, Inc., K-Fuel Partnership, Theodore Venners, and Koppelman Fuel Development Co. alleging, among other claims, misappropriation of Fru-Con's trade secrets. Defendants moved for summary judgment on all of Fru-Con's claims, and the district court granted the motion. Fru-Con appeals only the misappropriation of trade secrets claim, and we affirm.[1]

## I

In June 1989, Energy America, Inc. (EAI) and K-Fuel Partnership (KFP) formed a corporation, EA-K Energy (EA-K). EAI and KFP each owned fifty percent of the common stock. EA-K was created to develop coal processing

---

[1] Fru-Con moves to strike portions of defendants' supplemental appendix, contending it contains impermissible information including deposition testimony that was not before the district court, and portions of defendants' brief relying on the supplemental appendix. Defendants admit their error in including this material. We grant Fru-Con's motion to strike and ignore the improperly included information and all references to such information in defendants' brief.

facilities in North America, which were to transform low-grade coal into a better fuel called K-Fuel. EA-K and KFP contacted Fru-Con about constructing and operating the K-Fuel plants and Fru-Con's West German parent corporation Bilfinger + Berger Bauaktiengesellschaft (B+B) about acquiring an interest in EA-K. After negotiations among the parties, Fru-Con drafted an "Initial Notice To Proceed and Letter of Intent Respecting EA-K Energy Company, Inc." (Letter of Intent), dated August 8, 1989, which set forth the parties' intentions to finance, construct, and operate the first of four Series B K-Fuel plants (the Unit 1 Project) near Gillette, Wyoming.[2] All parties signed the Letter of Intent.

Under the Letter of Intent, the parties agreed to negotiate in good faith for the execution of three separate agreements: a Shareholder's Agreement; an Engineering, Procurement and Construction Contract (EPC Contract); and an Operation and Management Agreement (O+M Agreement). The Letter specified the parties' intentions regarding the Shareholder's Agreement by providing, among other things, that "B+B shall make a capital contribution of up to $7.5 million in return for up to 10% of [EA-K] stock," and that EA-K "shall obtain firm financing commitments within 60 days of the date of this Letter of Intent for

_____

[2] A patent for the Series B K-Fuel process was granted and assigned to KFP on January 4, 1990. A patent for the Series C K-Fuel process was granted and assigned to KFP on August 29, 1995. Fru-Con played no role in obtaining the patents, nor does Fru-Con have any license or patent rights in either K-Fuel process. Aplt. App. at 783-84.

all amounts necessary to complete the development and construction of the Unit 1 Project." Aplt. App. at 13A. With regard to Fru-Con's role in the joint venture, the Letter of Intent provided:

> e.) That Fru-Con, B+B's American subsidiary, shall, beginning immediately and continuing until a financial closing sufficient to fund the Unit 1 Project ("Financial Closing"), provide detailed engineering, site investigation, preparation of such permit applications, specifications and purchase orders for long lead items and any other such services as mutually agreed by the parties to be necessary to obtain financing and to meet the "in-service" requirements of Section 29 of the Internal Revenue Code of 1986 for the Unit 1 Project no later than December 31, 1990 [the Bridge Loan]. In the event Financial Closing does not occur within sixty days of the date of this Letter of Intent, Fru-Con shall not be required to perform any further services and B+B shall have no further obligation to make a capital contribution to [EA-K] Energy, but Fru-Con shall be nevertheless entitled to 1.33% of stock ownership in [EA-K] Energy for every one million dollars or portion thereof expended by Fru-Con at such time. Fru-Con may, at its option, continue to perform work necessary to keep the Project on schedule after the 60 days, however, for each additional $1,000,000 of expenditures or proportion thereof, its ownership of stock shall also increase by 1.33%. At the Financial Closing if it occurs within 60 days of this Letter of Intent, B+B agrees to make a cash capital contribution of up to $7.5 million, whereupon an amount of such contribution equal to the amount then outstanding under Fru-Con's Bridge Loan shall be distributed directly to Fru-Con by [EA-K] Energy as payment under the EPC contract for all services rendered to the date of B+B's capital contribution.

Aplt. App. at 13A-14. Finally, paragraph (f) stated "[a]s long as B+B and/or Fru-

Con have an ownership interest in [EA-K] Energy, Fru-Con shall have the exclusive right for all K-Fuel . . . design-build, operation, and maintenance contracts." Aplt. App. at 14.

The Letter of Intent stated the parties' agreement to negotiate in good faith an EPC Contract between Fru-Con and EA-K for the design and construction of the Unit 1 Project. It also restated Fru-Con's obligation to proceed with any work necessary to obtain financing until financial closing occurred so long as it occurred within sixty days of the Letter of Intent. The O+M Agreement was also to be negotiated in good faith by Fru-Con and EA-K and was to provide for the operation and management by Fru-Con of the Unit 1 Project for fifteen years.

Finally, the Letter of Intent provided that EAI, KFP, B+B, and Fru-Con "will not participate in the development, financing, owning, and operating of the K-Fuel plants in North America except through [EA-K] Energy." Aplt. App. at 15. Most importantly for our purposes, the Letter of Intent contained a clause discussing the legally binding effect of its provisions:

> The parties understand, and agree, that except for Fru-Con's obligation to provide the Bridge Loan for a period of 60 days from the date of this Letter of Intent and the right of Fru-Con to a pro rata interest in [EA-K] Energy pursuant to paragraph e.) the matters set forth in the preceding paragraphs do not constitute a legally binding agreement . . . .

Aplt. App. at 15.

In accordance with the terms of the Letter of Intent, Fru-Con immediately began performing various engineering and design tasks for EA-K. However, EA-K was unable to obtain financing for the Unit 1 Project within sixty days. Despite EA-K's failure, Fru-Con proceeded with its work on the Unit 1 Project through May 1990. At that time, Fru-Con sent an invoice to EA-K for $1,864,183.97 for the work it had done on the Unit 1 Project under the Letter of Intent.

On November 2, 1990, Enserv, Inc., a wholly owned subsidiary of Wisconsin Power & Light Co., purchased all of EAI's stock in EA-K and a portion of KFP's stock in EA-K. As a result of the transaction, Enserv owned 80% of EA-K and KFP owned the remaining 20%. Enserv provided immediate funds to continue work on the Unit 1 Project. Nevertheless, EA-K was ultimately unable to obtain financing for the project. The Shareholder's Agreement, EPC Contract, and O+M Contract were therefore never executed by the parties, and EA-K did not pay Fru-Con's bill of $1.8 million for work done through May 1990. Fru-Con never requested that EA-K issue any stock to Fru-Con in payment for its services, nor did EA-K present Fru-Con with a pro rata share of its stock as payment. By May 1991, EA-K had ceased to exist as a corporate entity and the parties to the Letter of Intent ceased their joint efforts to develop K-Fuel plants.

Despite the demise of EA-K, both Fru-Con and KFP worked independently

with other entities to realize their initial objectives under the Letter of Intent to develop K-Fuel plants in North America. In May 1991, KFP and Enserv created a company called Heartland Fuels Corp. (Heartland), owned 80% by Enserv and 20% by KFP. KFP subsequently transferred to Heartland its license to develop the Series B K-Fuel process in North America. Fru-Con began working with Heartland to obtain financing for a Series B K-Fuel facility. Fru-Con and Heartland executed a confidentiality agreement which provided that Heartland could disclose Fru-Con's confidential information only for the limited purpose of obtaining financing through a specific Department of Energy grant.

Fru-Con was compensated for some of its continued work on the Series B K-Fuel process performed after May 1990. It received approximately $124,000 from Enserv and Heartland for work completed on various engineering and construction projects from December 1990 through early 1993. It also received approximately $1.4 million from Energy Brothers Technology, Inc. and Wyoming Research Institute for engineering work completed for the period April 1990 through May 1991. In early 1993, Heartland's attempts to obtain financing for the project failed and Fru-Con stopped working on the Series B K-Fuel plant altogether.

KFP also independently sought to develop K-Fuel plants using the Series C

process with Harris Group.[3] To facilitate Harris Group in developing Series C K-Fuel plants, KFP transferred Fru-Con's allegedly confidential work on the Series B process to Harris Group in late 1992 through the middle of 1994. Included within this information was an eight volume set of "EA-K Partnership Project Books," which consisted of Fru-Con's work through February 1990 on the Unit 1 Project. Fru-Con contends that Harris Group reviewed and relied on Fru-Con's work on the Series B K-Fuel plants in constructing and designing the Series C plants.

KFX, KFP's corporate successor,[4] originally initiated this suit in state court in November 1995 seeking a declaratory judgment that Fru-Con had no claim against KFX with respect to any of KFX's K-Fuel plants. The case was removed to the United States District Court for the District of Wyoming, and Fru-Con filed a counterclaim against KFX and a third party complaint against additional defendants alleging, among other things, misappropriation of trade secrets. The parties were subsequently realigned with Fru-Con as the plaintiff and KFX, KFP,

---

[3] The Series B and Series C processes utilize different methods of heating coal to produce K-Fuel. The Series C process uses nitrogen and an external heat source, i.e., hot oil, to indirectly heat coal, while the Series B process uses steam in direct contact with coal.

[4] In December 1992, KFP assigned its interests in the K-Fuel process to KFX, and KFP consented to the transfer of all its assets and its dissolution and/or merger into KFX.

Koppelman Fuel Development Co. (KFDC), and Mr. Venners as defendants.[5] In its amended complaint, Fru-Con asserts that its preliminary engineering and design work on K-Fuel plants was confidential and that KFP transferred Fru-Con's confidential work product to third parties for KFP's own benefit and personal gain. Fru-Con seeks $1,864,183.97 in damages, the amount of Fru-Con's invoice for its work on the Unit 1 Project under the Letter of Intent through May 1990. The defendants moved for summary judgment on all Fru-Con's claims, and the district court granted the motion. Fru-Con appeals only the district court's grant of summary judgment on the misappropriation of trade secrets claim.

The district court first noted that the Colorado Uniform Trade Secrets Act, Col. Rev. Stat. Ann. §§ 7-74-101 et seq. (UTSA), governed Fru-Con's claim for misappropriation of trade secrets because the tort occurred in Colorado. However, the court further observed that resolution of the trade secrets claim hinged on whether relevant portions of the Letter of Intent constituted a legally binding contract. As Fru-Con conceded at oral argument before the district court,

---

[5] Mr. Venners was one of the original partners in KFP, and in December 1985 he assigned his interest in KFP to KFDC, a limited partnership in which he was the sole general partner. In December 1992, KFDC and Mr. Venners assigned their interests in the K-Fuel process to KFX, and KFDC consented to the transfer of all its assets and its dissolution and/or merger into KFX. To simplify matters, we will generally refer to all defendants as KFP unless otherwise noted.

if Fru-Con sold its work under the Letter of Intent, then Fru-Con could not maintain that the information KFP transferred to Harris Group was acquired by "improper means" within the meaning of the UTSA. See Colo. Rev. Stat. § 7-74-102(1) (1997). The court therefore looked to the factors set forth in the *Restatement (Second) of Conflict of Laws* to determine which state law should govern whether the Letter of Intent constitutes an enforceable contract, and concluded Missouri law applied.

The district court held that two provisions of the Letter of Intent constituted an enforceable agreement under Missouri law: (1) Fru-Con's obligation to provide the Bridge Loan for sixty days; and (2) Fru-Con's right to 1.33% of EA-K stock for every one million dollars expended by Fru-Con as delineated in paragraph (e) of the Shareholder's Agreement. In the district court's view, the Letter of Intent clearly expressed the parties' intent that if financial closing did not occur within sixty days, the *only* compensation Fru-Con would receive for its services was a percentage of stock ownership in EA-K. The court held it did not have to look to extrinsic evidence to discern the parties' intent because the terms of the contract were unambiguous and not reasonably susceptible of a different construction. In short, the court concluded Fru-Con sold its work to EA-K under the Letter of Intent, defeating Fru-Con's underlying claim for misappropriation of

trade secrets under the UTSA.[6]

## II

We review a district court's grant of summary judgment de novo, viewing all the evidence in the light most favorable to the nonmoving party. Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 797 (10th Cir.1997). Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

Initially we note the parties do not dispute the district court's conclusion that Colorado law governs Fru-Con's misappropriation of trade secrets claim. Nor do the parties dispute the court's application of Missouri law to determine the

---

[6] At several points in its appellate briefs, Fru-Con appears to base its misappropriation of trade secrets claim on information KFP allegedly received in breach of the confidentiality agreement executed between Fru-Con and Heartland, contending KFP did not acquire any of Fru-Con's allegedly confidential information under the Letter of Intent but rather acquired it through Heartland. Aplt. Br. at 16-17, 22; Aplt. Reply Br. at 5-6. However, Fru-Con did not plead any facts pertaining to the Heartland confidentiality agreement in its amended complaint, and it seeks damages in the exact amount of its invoice to EA-K for the services it performed under the Letter of Intent through May 1990. In addition, Fru-Con never argued below that KFP misappropriated its trade secrets by receiving information from Heartland in violation of this confidentiality agreement. Fru-Con's brief and oral argument before the district court focus solely on the proper construction of the Letter of Intent as the basis for the misappropriation of trade secrets claim. We decline to consider for the first time on appeal any argument Fru-Con raises with regard to the Heartland confidentiality agreement or any work Fru-Con performed for Heartland after the EA-K joint venture fell through. We will confine our review to the work Fru-Con performed for EA-K under the Letter of Intent through May 1990.

interpretation and enforceability of the Letter of Intent in resolving the underlying tort claim. We therefore look to Missouri law in construing the Letter of Intent to determine whether a violation of the Colorado UTSA has ultimately occurred.

The UTSA defines "misappropriation" in relevant part as:

> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
> (I) Used improper means to acquire knowledge of the trade secret; or
> (II) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
> (A) Derived from or through a person who had utilized improper means to acquire it;
> (B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> (C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Col. Rev. Stat. § 7-74-102(2) (1997). "Improper means" is in turn defined as including "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means." Id. § 7-74-102(1). We agree with the district court that if Fru-Con properly sold its work under the Letter of Intent, Fru-Con cannot maintain that KFP acquired Fru-Con's work through "improper means" or "under circumstances giving rise to a duty to maintain its secrecy or limit its use." We now turn to the interpretation and enforceability of the Letter of Intent.

**A**

Fru-Con first contends the district court erred in holding the Letter of Intent unambiguously provided that Fru-Con sold its work product for a right to receive a percentage of EA-K stock. Fru-Con asserts the Letter of Intent is ambiguous and should be interpreted as providing that EA-K owed Fru-Con monetary compensation for its services regardless of whether financial closing occurred within sixty days, and that Fru-Con's right to stock merely represented additional compensation or security owed to Fru-Con if EA-K was unable to obtain financing. Fru-Con points to extrinsic evidence which allegedly supports its interpretation of the Letter of Intent.

The primary objective in interpreting a contract is to ascertain the intent of the parties and to give effect to those intentions. If the contract is unambiguous, the intent of the parties must be determined from the contract alone. Forst v. Bohlman, 870 S.W.2d 442, 446 (Mo. Ct. App. 1994); Rosenthal v. Jordan, 783 S.W.2d 452, 456 (Mo. Ct. App. 1990). "A court cannot go outside an unambiguous agreement and make a new contract for the parties." Bydalek v. Brines, 947 S.W.2d 135, 142 (Mo. Ct. App. 1997); see also Lake Cable, Inc. v. Trittler, 914 S.W.2d 431, 436 (Mo. Ct. App. 1996). A court determines as a matter of law whether a contract is ambiguous. Royal Banks v. Fridkin, 819 S.W.2d 359, 361 (Mo. 1991). "A contract is ambiguous when its terms are susceptible

of more than one meaning so that reasonable persons may fairly and honestly differ in their construction of the terms." Kingston Elec. Inc. v. Wal-Mart Properties, Inc., 901 S.W.2d 260, 263 (Mo. Ct. App. 1995). In determining whether an ambiguity exists, the court must consider the instrument as a whole. Rosenthal, 783 S.W.2d at 456.

Viewing the Letter of Intent in its entirety, we agree with the district court that its terms are clear and unambiguous. The parties set forth their intentions to work exclusively with each other through the newly formed corporation EA-K for the purpose of financing, owning, and operating K-Fuel plants in North America. They outlined the initial responsibilities of each of the parties in launching the joint venture. EA-K, with the help of EAI, was responsible for obtaining firm financing commitments within sixty days of the Letter of Intent. B+B was responsible for making a capital contribution of up to $7.5 million for up to 10% of EA-K stock. Fru-Con was responsible for immediately providing certain enumerated engineering and design services necessary to obtain financing until financial closing occurred (the Bridge Loan).

The Letter of Intent expressly conditioned B+B's obligation to make a capital contribution, which in turn determined the type of compensation Fru-Con was to receive for providing the Bridge Loan work, on whether EA-K was able to obtain financing within sixty days. If the financial closing occurred within sixty

-14-

days, B+B would be obligated to make a cash contribution of up to $7.5 million, and from this cash contribution EA-K would pay Fru-Con for all services rendered to the date of such contribution. If, on the other hand, the financial closing did not occur within sixty days, (1) Fru-Con would not be required to perform any further services; (2) B+B would be under no obligation to make a capital contribution to EA-K; and (3) Fru-Con would nevertheless be entitled to a pro rata interest in stock of EA-K. Fru-Con could, "at its option," continue to perform work on the Unit 1 Project even after the sixty days. For its continued services, Fru-Con would receive the same pro rata stock interest in EA-K. Moreover, as long as B+B or Fru-Con maintained an ownership interest in EA-K, Fru-Con would have exclusive rights to all K-Fuel construction, operation, and maintenance contracts.

Despite the various obligations of the parties described above, the Letter of Intent clearly specified that the only legally binding agreement was "Fru-Con's obligation to provide the Bridge Loan for a period of 60 days from the date of the Letter of Intent" and the "right of Fru-Con to a pro rata interest in [EA-K] Energy pursuant to paragraph e.)," i.e., 1.33% stock ownership in EA-K for every $1,000,000 expended by Fru-Con. Nowhere in this clause setting out the parties' intentions regarding the legally enforceable provisions of the Letter of Intent does it discuss the right of Fru-Con to any form of monetary compensation. Moreover,

paragraph (e) contains no indication that the stock interest was additional compensation or security for EA-K's failure to obtain financing within sixty days or that EA-K would provide monetary compensation to Fru-Con regardless of whether the financial closing occurred within the specified time frame. In accordance with Missouri law, we decline to construe as an ambiguity the Letter of Intent's silence on whether Fru-Con had a right to monetary compensation in the event financing was not obtained within sixty days. See Michigan Sporting Goods Distribs., Inc. v. Lipton Kendrick Assocs., 927 S.W.2d 570, 573 (Mo. Ct. App. 1996); see also Bydalek, 947 S.W.2d at 142.

Unfortunately for Fru-Con, financial closing did not occur within sixty days and B+B therefore did not make a capital contribution to EA-K from which EA-K could make cash disbursements to Fru-Con for its Bridge Loan work. The Letter of Intent unambiguously provides under these circumstances that in exchange for Fru-Con's services, Fru-Con was entitled only to a pro rata interest in EA-K stock. Fru-Con drafted the Letter of Intent and could have easily included provisions requiring monetary compensation regardless of whether financing was obtained, but did not do so. See Village of Cairo v. Bodine Contracting Co., 685 S.W.2d 253, 264-65 (Mo. Ct. App. 1985) (any uncertainty in contract "construed against the drafter"). There is simply no support on the face of the Letter of Intent to validate Fru-Con's interpretation of the contract.

**B**

Fru-Con next contends that even if the contract is unambiguous, its right to take a percentage of EA-K stock was an option and since it never elected to exercise the option there was no valid agreement between the parties. To support its position, Fru-Con relies on the Letter of Intent's specific reference to the "right of Fru-Con" to EA-K stock. However, simply using the term "right" or "option" does not automatically create an option contract. See Lake Cable, Inc., 914 S.W.2d at 433-34 (stock restriction agreement giving corporation "right" and "option" to repurchase shares of stock did not create option contract but rather first right of refusal). An option is

> a continuing and irrevocable offer which the optionor cannot withdraw during a stated period. It vests the optionee with a power of acceptance, and when the optionee accepts the offer in the prescribed manner, the option is deemed to have been exercised as to create a binding bilateral contract.

Id. at 434. Moreover, an option is a contract "collateral" to the main agreement between the parties and "is subject to the same requirements as other contracts." I.R. Kirk Farms, Inc. v. Pointer, 897 S.W.2d 183, 185 (Mo. Ct. App. 1995). To be valid, an option must be supported by consideration, and "the consideration for the option [must be] a thing apart from the consideration for the [underlying] sale." Ragan v. Schreffler, 306 S.W.2d 494, 499 (Mo. 1957).

Fru-Con mischaracterizes the Letter of Intent as an option. The agreement

-17-

does not reflect a continuing offer by EA-K which confers power on Fru-Con to create an enforceable contract by electing to take EA-K's stock in acceptance of the offer. There is no mention of any separate consideration to create an option contract prohibiting EA-K from withdrawing its offer for a stated period of time. Rather, the Letter of Intent is simply a transaction by which Fru-Con agreed to provide certain engineering and construction services for a period of sixty days, and in exchange for Fru-Con's services EA-K agreed to provide Fru-Con with a pro rata interest of its stock.

C

Finally, Fru-Con contends the Letter of Intent does not qualify as an enforceable contract. Missouri courts have held that the essential elements of an enforceable contract are 1) parties competent to contract, 2) proper subject matter, 3) legal consideration, 4) mutuality of agreement and 5) mutuality of obligation. See American Nat'l Ins. Co. v. Nobel Communications Co., 936 S.W.2d 124, 131 (Mo. Ct. App. 1996). The first, second, fourth, and fifth elements are satisfied here and are not disputed by the parties. For example, the element of mutuality of agreement was satisfied by the signature clause and signatures of both parties which appear on the Letter of Intent. Neither Fru-Con nor EA-K claimed fraud or deceit and the Letter of Intent adequately detailed the obligations of both parties in paragraph (e). Fru-Con contests the third element, that of consideration,

contending it defies logic to believe it would perform costly engineering services in exchange for a mere right to receive a minor stock interest in a new company.[7]

To constitute a valid agreement it is irrelevant that Fru-Con never actually received the EA-K stock so long as Fru-Con's right to such stock constitutes sufficient consideration. See Misemer v. Freda's Restaurant, Inc., 961 S.W.2d 120, 122 (Mo. Ct. App. 1998). "A promise by one party to a contract is a sufficient consideration for a promise by the other party." Ragan, 306 S.W.2d at 499. Here, EA-K promised Fru-Con the right to a percentage of its stock in exchange for Fru-Con's promise to provide design and engineering specs. This exchange of promises provides legally sufficient consideration.

Moreover, "[c]onsideration sufficient to support a contract may be either a detriment incurred by promisee or a benefit to the promisor." Misemer, 961 S.W.2d at 122; see also Duvall v. Duncan, 111 S.W.2d 89, 92 (Mo. 1937). "[A] finding of consideration does not depend on the existence of . . . a money

---

[7] Fru-Con asserts that the "only reasonable explanation" for making such an unequal exchange is that it retained all rights and interests in its work. Aplt. Br. at 19. As we pointed out with regard to Fru-Con's right to monetary compensation in the event financial closing did not occur within sixty days, Fru-Con drafted the Letter of Intent and could have easily included provisions discussing the confidential nature of its work product but did not do so. We decline to interpret the Letter of Intent's silence on this point as an ambiguity, Michigan Sporting Goods, 927 S.W.2d at 573, and we will "not read into a contract words which the contract does not contain," Smoot v. Hyde, 855 S.W.2d 399, 403 (Mo. Ct. App. 1993).

-19-

payment." Lake Cable, 914 S.W.2d at 434. Missouri courts have held the benefit conferred by the prospect of financial gain or by avoiding the risk of loss furnishes sufficient consideration to support a contract. See Dyer-Bussey Realtors, Inc. v. Wright, 647 S.W.2d 215, 217 (Mo. Ct. App. 1983); Duvall, 111 S.W.2d at 92; see also Spaulding v. Benanati, 442 N.E.2d 1244, 1246 (N.Y. 1982) (expectancy that customers would return to seller's former business location sufficient consideration to support dentist-buyer's promise to pay $4000 in exchange for good will of deceased dentist's practice).

Despite Fru-Con's contentions to the contrary, the minor stock interest in EA-K was not entirely without value. The parties agreed to negotiate in good faith for a term in the proposed Shareholder's Agreement providing that as long as B+B or Fru-Con retained an ownership interest in EA-K, Fru-Con would have exclusive rights to K-Fuel contracts. Fru-Con's minor stock interest in EA-K could therefore have resulted in a very lucrative, exclusive deal for Fru-Con had things gone as planned. In return for agreeing to provide the Bridge Loan work, Fru-Con received the benefit of the prospect of exclusive rights to K-Fuel contracts. This expectancy constitutes sufficient consideration to establish a binding legal agreement.

Once a determination of sufficient consideration has been made, the adequacy of the consideration is generally not a proper subject for judicial

-20-

scrutiny.  See 17A Am. Jur. 2d *Contracts* § 135 (1991).  Although with hindsight

Fru-Con's decision to enter into this agreement may have been a regrettable one,

> [t]he policy of the law is to let parties weigh the benefits
> pro and con and leave them free to make whatever
> contract between themselves that they please.  The
> general rule of freedom of contract includes the freedom
> to make a bad bargain.

Bydalek, 947 S.W.2d at 143 (citations omitted).  Fru-Con is left with its bargain

regardless of its wisdom or folly.  We decline to rewrite the agreement simply

because the expectancy for which Fru-Con bargained did not come to pass.

Fru-Con also contends the Letter of Intent is not enforceable because it is

merely a manifestation of the parties' intent to agree in the future, and the terms

are not sufficiently clear or definite to enforce.  In many respects, the Letter of

Intent does express the parties' intent to negotiate contracts in the future and is

therefore not binding on the parties.  See American Nat'l Ins. Co. v. Nobel

Communications Co., 936 S.W.2d 124, 132 (Mo. Ct. App. 1996).  But the Letter

of Intent is not merely "an agreement to agree in the future."  Aplt. Br. at 18.  As

we have noted, the Letter also unambiguously constitutes a legally binding

agreement under which Fru-Con is obligated to provide certain services for a

period of sixty days in exchange for a pro rata interest of EA-K stock.  The Letter

of Intent clearly expresses the parties' intent to be bound presently, and not some

time in the future, with regard to these two provisions.

-21-

Fru-Con asserts the agreement is insufficiently clear or definite with respect to its obligation to provide the Bridge Loan work. We disagree. The contract enumerates in detail the services to be performed by Fru-Con ("detailed engineering, site investigation, preparation of such permit applications, specifications and purchase orders for long lead items and other such services as mutually agreed by the parties to obtain financing and to meet the 'in service' requirements of Section 29 of the Internal Revenue Code of 1986 for the Unit 1 Project"), and recites with specificity the time frame in which those services are to be performed ("for a period of 60 days from the date of this Letter of Intent [August 8, 1989]"). We are persuaded the Letter of Intent sets forth the parties' respective obligations with sufficient clarity and definiteness to constitute an enforceable contract.[8]

### III

In sum, the Letter of Intent is unambiguous and constitutes a valid, bargained-for exchange of Fru-Con's work. As such, KFP did not acquire Fru-Con's work through "improper means" or "under circumstances giving rise to a duty to maintain its secrecy or limit its use." Fru-Con's misappropriation of trade

---

[8] Fru-Con's argument that a material issue of fact exists as to whether KFP misappropriated Fru-Con's trade secrets is predicated on the assumption that "no sale occurred under the Letter of Intent." Aplt. Br. at 22. Since we hold Fru-Con sold its work under the Letter of Intent, we need not address this argument.

secrets claim under the UTSA therefore fails.

**AFFIRMED.**